I'd like to start briefly, if I may, with question D that this court posed about the disablement provision. Now, TIVO asks this court to uphold contempt on a patent injunction that TIVO reads as an unprecedented prohibition on non-infringing desire rounds for over a But that is not what this injunction says. It's the opposite of what TIVO asked for, and ECHOSTAR should not have been expected to read it that way. Now, just because there are multiple versions of this, and we'll all be looking at it, I asked the court to look at page 161 of the record. It's at the back of the reply brief that's unbunked, just so that we're all on the same page. Now, nowhere does this injunction explicitly say what TIVO says. It says that this is a curse on the hardware. It applies to infringing products. Now, in this injunction, infringing products means exactly what it means in ordinary English, products that infringe. TIVO's argument revolves entirely around a purported definition that it finds in the very first sentence of the injunction. That's on page 161. Now, first of all, that is an exceedingly subtle way to impose such an extraordinary remedy. According to TIVO, it means that every time you see the words infringing products, substitute eight model numbers regardless of whether they infringe or not. Mr. Rosencrantz, I understand your argument in the case for a client, but of course we're here and back dealing as well with broader issues. Should we revise the KSM case? And is colorable too vague a term to the language? Well, Your Honor, I'll answer that briefly, and then if I may just finish up my argument on the disablement provision. I don't think it's at all vague. This court has provided enormous meaning to the colorable differences standard with a series of principles like the preclusion principles and summary adjudication principles, which, if it's okay with Your Honor, I'll get to in just a moment, and I promise you I will cover it. You'd be in pretty good shape if it were impermissibly vague, wouldn't you? I didn't hear the first half. You'd be in pretty good shape if colorable differences were impermissibly vague. Yes, Your Honor, and then this court would have nothing to go to, but that's the standard that's been around for 150 years, and it's worked perfectly well without any of the parade of horribles that Thiebaud has described. But if I may just very briefly get back to the disablement provision and then turn to colorable differences. And again, I ask the court to look carefully at the language with me, because Thiebaud's definitional feature, the way that they define infringing products, even Thiebaud will acknowledge, simply cannot work anywhere else that this definition, that this term is used in the injunction. So just to orient the court, on page 162, there are three consecutive sentences that use the words infringing product. The first one is that big paragraph right in the middle of the page. That's the infringement clause. The next sentence is the beginning of the disablement provision. That's what we've been calling the disablement clause. And the next section after that is what we've been calling the do not enable clause. So let's try that definition in each of those spots. The first spot, three lines down from the beginning of that first whole paragraph, means, it says, the defendants are, quote, enjoined from making, using, etc., the infringing products. According to Thiebaud's definition, that means the defendants are enjoined for making or using the following model numbers of receivers. So it's a curse on the whole family of receivers, whether or not they have DVR technology, whether or not they infringe. That can't be what that means if no one said that it is. The next sentence down is our sentence. The sentence after that, it's the last sentence on that page. The DVR functionality, etc., shall not be enabled in any new placements of the infringing products. So that means the DVR technology shall not be enabled in any new placements of the following model numbers. Thiebaud tells us on page 21 of its opening brief that it doesn't mean that. And I quote, nothing in the injunction, however, prevents EchoStar from providing DVR functions using new, non-infringing receivers. Well, if Thiebaud needs to read the same exact words two different ways in three consecutive sentences, it can't possibly claim that its position is clear. I don't want to inch. I know people. Let me go on. There are several ways we can look at this. Either it can be clear, as Thiebaud says, on its end, your position is, however, not that it's ambiguous, but that it's clear on the other end. Yes, you are. All right. What if Thiebaud is right? If it's clear, would you still have an argument that read clearly even, it's permissively overly broad, and therefore outside of the court's discretion under 283? Would that still be your position, or would you be bound up in this whole way longer? Your Honor, I don't want to spend a lot of time on that except to say, yes, that's our patent injunction needs to be read to tailor it down to what the law requires. A patent injunction is different from other injunctions. I thought that under United Wine Workers and Walker and the recent Supreme Court case, an overbroad injunction has to be vindicated by appeal, not by contempt. This Court has said that. And let me just remind the Court, of course, this injunction was being read against the backdrop of both the preexisting law, which said that it is only permissible to award an injunction to do anything but prevent infringement, and against the context in which Thiebaud never requested any such broad injunction. But what's the answer? If the injunction's overbroad, don't you have to vindicate it by appeal rather than by going into contempt? Isn't that correct? Yes, Your Honor, if it is clearly overbroad. But Thiebaud acknowledges on page 58 of its So if it's vague, you can't be held in contempt? If it is anything other than clear, Your Honor. And every circuit interpreting Granny Goose has said that Granny Goose means the injunction has to be unambiguous. This Court has said it in Abbott. And again, if the score wants to change the law, it's free to do so. But this injunction was being read against the backdrop of this law. Thiebaud never requested the sort of extraordinary relief that the District Court has now set to award. Now, I will, as Judge Worre requested, turn to the colorable differences issue. On pages two to three of our opening and bond brief, Your Honors, we list nine reasons why Echo Star's redesign was different from the original adjudicated devices. Thiebaud has never disputed most of them. First and foremost, we removed... But what about KSM? KSM says this is a threshold inquiry. Maybe it's not right. Maybe it's not a threshold inquiry. Maybe it's part of the contempt finding that you have to satisfy the colorable differences test. I believe it is, Your Honor. And so I think does Thiebaud that that's the one respect in which we would urge the Court to tweak Thiebaud, not particularly critical to us. And that is as follows. This is a contempt proceeding. The central question in a contempt proceeding is, did we violate the injunction? This is an injunction that prohibited us from making a device that is the same or not more than colorably different. The central question, therefore, is, is this more than colorably different? That's got to be a question, as any question about violations, that needs to be proven by clear and convincing evidence, not just something that we defer to the district court on. And since that goes to the violation of the injunction, shouldn't that all be determined by the court in the hearing? It seems strange to me that the colorable differences would be a gatekeeper. I agree, Your Honor. It is ordinarily and ought to be the very first thing a district court decides because you don't want a district court deciding infringement without first deciding whether it's more than colorably different. But yes, Your Honor, it is part of the contempt proceeding. The whole thing is the contempt proceeding, and ordinarily step one should be, is this the same device? Is this essentially the same device, which is what colorable differences means? Why shouldn't it be one inquiry, colorable differences being the same as infringement? Well, Your Honor, because colorable differences is different. And why shouldn't it just be a fair ground of doubt, a reasonable basis for? As to whether this new device also infringes? Well, two reasons, Your Honor. First, in this case, this injunction said colorable differences. But secondly, I know the court is asking more broadly about future cases. KSM followed a line of cases that were quite persuasive on the proposition that the U.S. Supreme Court has adopted that it is unreasonable to impose an injunction that is as broad as do not violate the law, do not infringe. And so for 150 years, the courts, in order to avoid that kind of overbreadth, in order to comply with the requirement to give the parties some sort of certainty, the courts have adopted that standard as the crucial standard. But I would just, before I sit down... Is colorable differences an infringement test, or is it a test that requires comparing the product with the one found to infringe? It is the latter, Your Honor. It is a comparison between two products, but always through the lens of whether the change is relevant to the claim terms. So the claim terms are not irrelevant, but it's not a super patent infringement question. If TIVO or a plaintiff in its position wants to preserve its right to exclude when the device is different, they have an option. They can go to the district court, they can go to the very same judge with a new patent infringement case and seek a preliminary injunction. Now, I was just saying that I'd like to just finish with this. Wouldn't you also have to have a trial at that point to determine whether or not the alleged new product would also infringe the claims? Maybe, maybe not. There might be summary judgment, for example, but it's the perfect balance, right? I mean, the TIVOs of the world get to enjoin if it's as clear as they say it is while the trial is going on, and then the jury decides the new infringement question. Mr. Rosencrantz, you mentioned a minute ago, I believe, that you don't feel that there should be a two-step process, that the contempt issue is really one question. Is that correct? No, Your Honor. Let me just offer a friendly amendment to that. What I said was that there is no gatekeeper question. Let's do colorable differences first and then figure out whether we're holding a contempt hearing. Well, then what does this mean? In the California Artificial Stone, the Supreme Court said, the process of contempt is a severe remedy and should not be resorted to where there is a fair ground of doubt. It sounds to me like sort of a threshold question. Is there a fair ground of doubt? If there is, then perhaps contempt is not appropriate. If there is not, then let's proceed. A fair ground of doubt, Your Honor, as to the wrongfulness of the defendant's conduct. Now, by the way, in California Artificial Stone casing, that was a do-not-infringe injunction. It was before the line of cases that the Supreme Court and various courts and then this court adopted as to colorable differences. But let me just finish, if I may, with the colorable differences. Let me just ask you one question to try to clarify this. Suppose at the end of the day the district court finds someone in contempt and that contempt finding was correct. Would it be a defense that the proceedings should not have been initiated in the first place? If the infringement finding was correct, Your Honor? If the contempt finding was correct. At the end of the day, there's a contempt finding which was correct. Is it a defense to that that the proceedings should not have been initiated in the first place? Your Honor, the reason I'm hesitating is because it seems to me that's a theoretical impossibility. Well, the answer is no, isn't it? The answer is no. I'm saying no, that's a theoretical impossibility. There's no such thing as a contempt finding that is proper but should never have started in the first place. If it's more than probably different, that should be the end of the inquiry that the court should never get to infringement. I see a meeting well into my... No, you have another six minutes before you get to your rebuttal time. Please proceed. Okay, thank you, Your Honor. So, I was talking about the ways in which or the indications that this device is more than colorably different and I was starting with first and foremost that Echo Star removed the very features that Thiebaud had accused of infringement. Thiebaud's expert admits that those features are gone, including the feature that Mr. Waxman told this court was the, quote, genius of the invention. That's on pages 62-16. Secondly, in order to do that, Echo Star had to innovate. It had to figure out a new way to accomplish the same thing and it did. It achieved two technological feats that Thiebaud's own engineers said couldn't be done, its own inventors said couldn't be done and the PTO just granted a patent on that differential innovation. Thirdly, Thiebaud now has to map every disputed claim limitation on a different feature, either on a feature that wasn't even an issue in the trial before or on a feature on which it previously had mapped a different claim limitation. For a mapping of claim limitations that Thiebaud never presented before and that no jury ever adjudicated. Fourth, the contempt proceeding devolved into a battle, a fact battle, about what exactly this device does. Now this was not just a battle between two paid experts. Broadcom, the manufacturer of the chip, got on the stand, its engineer, and said this chip does not work the way Thiebaud says it does, the way Thiebaud had to prove it did in order to make out its infringement claim. I'm trying to understand the practical distinctions that we're talking about. Let's just say that the patentee believes that these are mere colorable differences, but there's room for argument. Your position, I gather, is that if there's room for argument, no contempt proceeding should be brought in the first place or that the patentee can raise that question as a matter of discussion and argument before the district court, because in the end, depending on the differences, if in fact the patentee has to bring a fresh infringement action, then the issue is tried to a jury, whereas if it's before the court in contempt, it's decided by the court. Other than the issues of delay and timing and scheduling, it's hard for me to see where there's a different basis for decision. Well, so first let me take the first half of the question, Your Honor, then I'll answer it in full. I wouldn't say, apropos also Judge Dyke's question, that there's ever a time where a district court is not allowed to conduct a contempt hearing. In other words, it is allowed to take witnesses, figure out what the differences are in, you know, the software case, for example. It needs that help. There will come a point where, and it may be varying different points for different district judges, at which the judge concludes, oh wait a minute, I now have enough. This is more than colorably different. Now to the question about what the ramifications are of an honest difference, a reasonable difference of opinion as to whether it's more than colorably different. But I thought your position was that the judge does not and should not make that determination of whether it's colorably different in a contempt proceeding at all. No, no, Your Honor, and I apologize. I know it's confusing. I call the whole thing a contempt proceeding. The big question in a contempt proceeding, to my mind, is does the judge ever get to infringement? At what point is the judge allowed to adjudicate infringement rather than the jury adjudicating infringement? The judge should never get to infringement if the devices are more than colorably different. He just never gets there. That becomes a jury question. And whether the devices are colorably different is adjudicated according to the no substantial open issues test. Yes, Your Honor. KSM, I think, was very persuasive on this question. There's a whole body of evidence that the defendant ultimately makes an argument about colorable differences that the court finds was wrong but reasonable. Every other circuit says that the reasonableness of the position should be at least relevant to determining whether there will be contempt. And some of them will reverse if the reasonableness was not assessed. But the real core, Your Honor, is colorable differences and is substantial open issues of infringement. And this court in KSM provided terrific guidance with numerous principles of KSM, such as preclusion principles, summary judgment principles. If there's a fact dispute about what this device does, that's a dispute of infringement. If there is a dispute of infringement at that point, what is the standard of review of evidentiary support? Would it have to be clear and convincing? The standard of proof is clear and convincing, yes, Your Honor, because this is about whether The standard of review is abuse of discretion. And the last point I was going to make here is that we are not quibbling with the district court's factual findings. The standard for review is abuse of discretion? Yes, Your Honor. For what? So it's whether facts were clearly wrong or whether the court made a legal error in its determination. And we are talking entirely about legal errors that the district court made. But you're not suggesting that somebody has discretion to hold somebody in contempt, right? The district court has the discretion at the end of the day to decide on the basis of whether there was a violation or not, that I will or will not hold someone in contempt. The grainy goose standard says not. You don't have discretion in finding a violation. Well, it's an abuse of discretion standard. Facts, the court finds, this court reviews for clear and convincing, excuse me, clearly erroneous. Issues of law, this court reviews de novo. And we are pointing at issues of law. Let me just mention two of them and then I will sit down. The first is central to the district court's opinion on page 824 is the view that removing a feature does not implicate a claim limitation if the party uses a label for that feature that it cannot find in the claim. And that's just wrong under this court's and Supreme Court rule. Secondly, the district court held that it simply does not matter what issues the jury decided when the whole colorable differences inquiry is about what was adjudicated previously. If there are no further questions at this point, I'd like to reserve the remaining time for questions. Thank you, Mr. Rosencrantz. Mr. Waxman. May it please the court. As our brief explains, we think the KSM's substantial open issues of infringement test is correct on page 7 of our brief. Is there a difference between the colorable differences test and the question of infringement? There is in the sense that KSM explains it, which is that any court, whether it's adjudicating – any court that has issued an injunction claimed to be violated, whether it's an environmental injunction, an anti-discrimination, an antitrust injunction, has to make both a procedural determination, that is, is the nature of the claim such that it's appropriate for me to proceed as an equity court, and if the answer is yes – The injunction here requires a finding of both colorable differences and infringement, correct? The injunction requires a – well, we're talking about the infringement provision and not the disability provision, which we'll get to, I assume. The injunction prohibits infringement by the adjudicated products or those not more than colorably different. So what the – Well, what I'm getting at is that it's a dual test. In other words, it requires infringement clearly, but I would have thought the colorable differences was a different test, and what it required was comparing the newly accused product with the one found to infringe. Yes, and as I was attempting to explain, the court has – this court has explained, as courts across American jurisprudence in fact practice it, that there is a procedural determination that a court asked to exercise its contempt authority and enforce its injunction has to make, and what this court has said is the standard to be applied in cases in which the contempt is alleged to be the infringement of a – How can you be held in contempt if they're colorable differences? Do you agree that you can't be held in contempt if they're colorable? No, the standard that this court has explicated, and I think both sides agree with it, is that if the differences are more than merely colorable, then the plaintiff has to institute a new action, and more colorable means – If the court upon inquiry, that is, learning what the supposed changes are, in light of the claims as construed, concludes that the differences are more than merely colorable, which is to say that they present substantial open issues of infringement to be resolved – That's where I see the problem. It seems to me that the two tests are different, that a test is comparing the product or process that was found to infringe with a newly accused product or process, and that that's a different test, an infringement. Do you disagree with that? I don't disagree with it. It's been called a threshold determination, but both sides agree that at any point along the way a court can just say, you know what, these differences are just too substantial, it's going to require too much testimony, there's too much determination that a court has to make when somebody comes and says, you issued an injunction, they are violating the injunction, we want you to hold them in contempt and enforce it. A court makes a determination of what is it that's being done, in the infringement context, it's comparing the accused products with the supposedly modified products, in light of the claims as construed, in order to determine, one, whether the products are sufficiently similar so that any open issues can be resolved in a relatively streamlined follow-on to the original proceeding, and second, in which there is a reasonable likelihood that the patentee will be able to prove by clear and convincing evidence that the modified products continue to infringe. If the answer to those questions is yes, then the court proceeds with a contempt proceeding to hear testimony, and he can find a defendant, an accused contendor, to be in contempt only if the court finds by clear and convincing evidence that the injunction was violated, which in the case of an infringement provision means infringement by clear and convincing evidence. Now in this case... Comparison between the product and the new product. The infringing product and the new product. In light of the claims as construed, in order to be able to ascertain whether there are any open issues of infringement, and if so, whether they are too substantial to be adjudicated in a summary proceeding. But if you're comparing the new product, the designer on product, with the claims themselves, is that really an infringement analysis which should be done anew, and it should not be done by the judge in a continuation of the contempt proceedings? The defendant has a right to a jury trial at that point, doesn't it? The defendant does not have... An equity court, having issued an injunction, having concluded, consistent with equity standards, that an injunction is appropriate, a court has to have the authority to determine whether it may enforce its injunction, and that is true across any area of the law. We're trying to figure out essentially when the judge is in fact enforcing the terms and conditions of the injunctions. That's right. Versus a new product which would not fit in within the original determination. That's exactly... It might even take new claim construction at that point, doesn't it? It might. I mean, this case, of course, doesn't present any of that because neither of the changes that EchoStar trumpeted even presents an open issue of infringement, let alone a substantial open issue of infringement. Well, Thiebaud argued that a media switch was performing the parsing of audio and video. Now, I understand the original EchoStar product also had a PID filter, but you're not going to have simultaneous parallel parsing. So if the media switch was doing the parsing of the audio video, the original PID filter in the EchoStar product would not have been parsing the audio and video, or at least we don't believe the jury found that because it was not argued to them that the PID filter was parsing the audio and video. Judge Moore, it's very, very important to maintain distinct something that EchoStar tries to obscure, which is there is a parsing limitation both in claim one, which requires a media switch that parses and separates, which is no longer at issue in this case, and claim 31, which requires a physical data source. Yes, which is what you referred to as software, which, by the way, I find baffling. That's an apparatus claim. If you can throw a pen at it and hit it, it's not software. The physical data source, according to the claim limitation of claim 31, requires that it accept broadcast data, that it parse audio and video data from such broadcast data, and that it temporarily store it. The only thing Kivo argued in the accused devices to perform the parsing of audio and video was the media switch. That is incorrect as to claim 31. It is absolutely incorrect. Let me try and explain a couple of things about what happened at the trial. There was no dispute at the trial, really, about either of the two limitations that they say are not met, the parsing limitation in claim 31 or the automatic flow control limitation. Now, before the trial even started, EchoStar's lawyer, Ms. Crevens, who just happens to be playing a dual role at both tables this morning, said to the court, and I'm quoting from 7784 of the joint appendix, it is undisputed in the EchoStar products that the physical data source is the PID filter hardware. Dr. Gibson identified it as such. Our expert agrees. Let's look at this a different way. It is now your claim that the PID filter satisfies the parsing limitation, correct? That is one of two elements in the product that parses, that is, that analyzes. But the PID filter was not found by the jury to satisfy the parsing limitation the first time around, was it? That's incorrect. I mean, there was no dispute as to claim 31. The jury was asked to render a general verdict. With respect to claim 1, that is, the hardware claim, they were saying, no, no, no, the only thing that parses is the PID filter. Both of our experts agreed at trial that PID filters... Well, no, but they were saying the only thing that parses is the PID filter, but they were saying it doesn't parse audio and video data, it only parses the header, which comprises the channel identification. That is what they say now. All three of their experts testified that the PID filters satisfy the parsing limitation of claim 31, which requires that it parse audio and video data from said broadcast data. That was their case. What we said, both Dr. Gibson and Dr. Storer, was PID filters parse. There's no dispute about that. But that's a question of what the jury found. Your argument to the jury was not that the PID filters satisfy the parsing limitation, right? Judge Dike, our argument to the jury was there was essentially no argument with respect to the software claims because they started off by saying everyone agrees that for purposes of the physical data source, the parser is the PID filter. The dispute, it was a battle royale at the trial, was whether or not the media switch limitation requires not only parsing, but parsing and separating was met. We said it was because the start code detectors created a logical index of all the audio and video frames. That was the issue with respect to claim 1. We did not in any way disavow the fact that PID filters analyze. Our experts said that they did. But our position was that the start code detector also analyzes it, and for purposes of claim 1, that is what creates the logical separation that meets the is-separated requirement of the media switch. Now, with respect to, and therefore what we have is before the trial even starts, we have an assertion by EchoStar that the PID filter is the physical data source. Both of our experts agree, all three of their experts affirmatively testify that it met the specific limitation that Judge Moore identified. And that's why... Aren't you talking about when their experts in the course of invalidity were arguing that prior references should be found to invalidate because they disclosed PID filters? No, not at all. In fact, Dr. Gibson's testimony, what we elicited on cross-examination of Dr. Gibson, the acknowledgement that PID filters parse. Now, what they say... Well, they say, well, one of our experts, Dr. Shore, acknowledged that PID filters parse... He was our validity expert in the context of cross-examination and the challenge of the prior artifacts. He didn't go on to say PID filters are parsing audio and video data. Now, whether this was their argument below or only their argument now, they're arguing that the parsing that is done is of a header, which is not audio and video data. The claim limitation simply requires that it analyze, and in fact, as all three of their experts correctly stated... But how can it analyze audio and video data? And it absolutely does in exactly the same way the start code detector does, which is it takes a screen... Doesn't this suggest a fair ground of doubt? I mean, that kind of conversation that we're having? It doesn't suggest a fair ground... I mean, I don't see how there can be a fair ground of doubt with respect to a limitation with a claim construction that was not appealed, a limitation that all five experts agreed at trial was met following a statement before trial by EchoStar's counsel that the PID filters are the physical data source in Claim 31. That's why the appeal in this case... Where do we find, in the district court opinion, in finding contempt that the PID filter was found in the original trial to satisfy the parsing limitation? I mean, I don't have the... I can give you the record citations for the testimony. I don't have the actual... I didn't see any such finding in that. I don't think the district court found that. I'll pull the district court... I thought what the district court said was it doesn't make any difference because the PID filter also would satisfy the parsing limitation. I don't see him as having found that that was the basis for the jury determination the first time around. The district court found that all three of their experts testified that PID filters parsed video... That's a different question. I'm talking about what the district court found, what the district court found that the jury found the first time around. I don't see the district court as saying that the jury the first time around found that the PID filter satisfied the parsing limitation. What the district court said, and this is absolutely correct as a matter of contempt law, that it is A, impossible to know what the district court found, particularly with respect to claims 31 and 61 where none of these elements were in dispute. The relevant issue is whether the claim as construed, that limitation is met. I mean, the district court said, here I have it on page 823, some or even all members of the jury may have believed from the testimony that parsing was satisfied by PID filtering rather than start code detection, which is absolutely correct, particularly with respect to the claims that are at issue here. I mean, that's why the panel is... So if they may have found it, they may not have found it. Judge Dyke, which suggests that there's a fair ground for doubt as to what the jury found the first time around, no? Judge Dyke, the question is not what the jury found. The question is whether there's a fair ground of doubt over whether these supposedly modified devices infringe the claims as construed. That's why in the context... That's your problem. You're conflating the culpable differences test and the infringement test. The culpable differences test, at least as I understand it, is a separate test that asks that you compare the original product found to infringe with the newly accused product or process. In light of the claims as construed, and that's why, for example, contempt can be applied as it was in KSM in the context of a consent decree, or with respect to claim limitations as to which, because there's no dispute at trial, the plaintiff's expert just gets on and says, yes, I read all the software code. Here's a chart that shows every limitation and the respect in which it was met, which is, in fact, what happened here. Just to make sure I understand your answer to Judge Dyke. So if the district court were to find, I think there's infringement, I think that this is parsing audio and video, but if he were to have concluded, but that's colorably different from, more than colorably different from the product the jury found to infringe, contempt would be improper in that case, right? Contempt would be... The question isn't what the jury found, with respect. The question is taking the allegedly modified devices and comparing them with the devices that were found to infringe in light of the claim limitations as construed. Are there any open issues of infringement? And if so, are they so substantial that they shouldn't be adjudicated in a relatively summary proceeding? Not just are there open issues of infringement. Suppose the district court looks and says, I think this infringes. I think the jury would conclude this infringes. However, this is colorably different from the product the jury was considering. In light of the claims, it is colorably different. Well, under KSM it has to be more than colorably different, which I think everyone agrees has been properly construed to mean that it presents substantial open issues of infringement. And that would be true, as I said, in a context in which there is a consent decree, a stipulation that the product infringes, or a case in which infringement is proven as to a variety of elements without contrary testimony, as was the case with respect to both the pit filters parsing in the software claims, and for that matter in the hardware claims, and also automatic flow control. I mean, there wasn't, we're talking about two issues that EchoStar identified in defense of a contempt citation that were not genuinely litigated at trial. There wasn't a dispute about the fact that pit filters parse as start code detectors parse. There wasn't a dispute about Dr. Gibson's explanation. Was there a dispute over what they parsed? No. There is an incoming MPEG stream, a multi-program MPEG transport stream that's got all sorts of audio and video data from a whole variety of channels. The pit filter goes through all of that. It looks at every bit until it finds a pit. Then when it finds a pit, it says, well, I want the pit that the viewer watched CNN 7 o'clock news. It finds those pits and it separates out the audio and video segments that are associated with it just as the start code detector, which is also part of the media switch, although it's not required in the software claims, looks through all of the stuff and finds where is the beginning of each audio and video data. Neither one of them actually represents a code that translates into sound coming out of the speaker or an image coming out of the screen, but they both, everybody agreed, they both parse video and audio data. Mr. Watson, before your time runs out, I just want to get to a question on the disablement. Sure. Do you agree that if we were to conclude there's any ambiguity in the original injunction, then there was inadequate notice under contempt and we cannot find contempt if there was ambiguity? No, absolutely not. I mean, first of all... I know you disagree whether there is ambiguity. I disagree and I'd like to explain after I answer your direct question why in fact there is none for purposes of this case. But in any event, even if there were genuine ambiguity, Echo Star was required under the Supreme Court's law and governing Fifth Circuit law to seek clarification as to that ambiguity. And in fact, what Echo Star did in this case was to seek clarification with respect to the disablement provision in two respects. First of all, when we asked for it, Echo Star said, asked that the disablement provision be read exactly in the manner that it now says it obviously has to be read. That is, that it apply to, quote, only the provision of infringing software. We explained you can't do that for the reasons that the district court explained, which is this is just an invitation to these people with respect to these devices that have been placed in homes that have already been found to infringe to continue to infringe in the future. And not only that, we explained, if you read the disablement provision the way they now said it should be read, the scope of the injunction would be exactly identical as if there were no disablement provision in it at all. I mean, if it were limited to only infringing software, it would be precluded by the infringement provision. Now, McComb and other Supreme Court cases and the Fifth Circuit cases that we cited say that if it is vague, if it is subject to some uncertainty, the burden is on the subject of the injunction to seek clarification. And only in the instance in which clarification is unavailable or rejected, which was the Supreme Court's international longshoreman's case, will you construe the ambiguity in favor of the infringer and not otherwise. But counsel, isn't it possible to have a difference between a latent and a patent ambiguity? Something that is not ambiguous on its face, but both parties walk away clearly convinced they won. I mean, you lawyers do it all the time, right? Regardless of the outcome, both sides tell their client, we won! And so, isn't it possible that two sets of lawyers could look at this injunction and come to both having a reasonable belief that it should be construed completely differently? At this point in the proceedings, having not sought... They did seek clarification of the disablement provision from the judge in another respect. But having not sought clarification, having run to this court and gotten a stay based on the representation that they were going to have to disable the DVR functionality and not raise one issue with respect to the scope of the injunction, any ambiguity falls on their heads. They ran the risk by downloading this supposed workaround while the appeal was pending, without telling anybody, as the Supreme Court has said in McComb and the Fifth Circuit has repeated over and over again, just because a provision may require some interpretation doesn't make it vague. And if it is vague, the burden is on the party who is the object of the injunction to either seek to clarify or modify... But there is an ambiguity now, Mr. Waxman, in light of the fact that our court, in the last appeal, said the hardware claims were not properly found to infringe. So now, all you have is the software claims. So couldn't that... Technically, shouldn't there maybe have been a revision of the injunction at that point below? Couldn't you now have a situation where, since our court held hardware claims are not infringed, an injunction which goes to preventing hardware use more generally? Or not to think it through that way? Judge Moore, there has never been anything that has precluded Echo Star, either before this court decided the first appeal or after, to ask the court to modify the injunction in light of whatever reasons it wanted. But the consequence of not having done that, the consequences of having laid in the weeds now for four years and disregarded every provision of this injunction, including the disablement provision, is that they must now... They can win on this point only if they can show that their reading is the only possible reading. Technically, shouldn't there maybe have been a revision of the injunction at that point below? Couldn't you now have a situation where, since our court held hardware claims are not infringed, an injunction which goes to preventing hardware use more generally? Or not to think it through that way? Judge Moore, there has never been anything that has precluded Echo Star, either before this court decided the first appeal or after, to ask the court to modify the injunction in light of whatever reasons it wanted. But the consequence of not having done that, the consequences of having laid in the weeds now for four years and disregarded every provision of this injunction, including the disablement provision, is that they must now... They can win on this point only if they can show that their reading is the only possible reading. Well, what Supreme Court case is that? McComb. McComb? McComb is dealing with the question of whether good faith is a defense, and it's saying it's not. No, but with respect, Judge Brey, McComb was all about whether the provision of the injunction that precluded violations of the Fair Labor Standard Act was too vague, and there was a dispute between the dissenting judges and the seven-member majority about that. Yeah, but there are a lot of Supreme Court cases that are contrary to McComb on that and say that you can't enjoin using the statutory language because it's too vague, right? Well, exactly. It's a vague issue. Those same cases, including Walker v. City of Birmingham, where Martin Luther King was held that he could not challenge a... No, no, no, no, no. Overbreadth cases. I mean, Granny Goose says if it's vague, it's a defense, doesn't it? Granny Goose says if it's vague, it's a defense, but there are all the other cases that we've cited, including Longshoreman's, including McComb, and including an unbroken line of governing Fifth Circuit law that if there is ambiguity, the burden is on the parties subject to the order to seek to clarify it. And isn't that the rule that makes sense? Wouldn't any good, vague competitor want to do that rather than do what Echo Star did in this case? And the very month that it got the stay from this court the first time, download all of the software, and then telling nobody, and then a year later, the day this court's judgment becomes final, says, ah, we don't actually have to do anything because we've concluded that we've downloaded non-infringing software. You said there was a second point at which they sought clarification. Well, they sought it, yes. Initially, they asked to have the disablement provisions modified to include only infringing software, which the court said, no, for the reasons we gave. They subsequently went to the court for clarification having to do with, I think it's, what happens when one of their machines that's in a home needs to be replaced and needs to be swapped out? And they got an adjudication on that. But the point here, I think this is going to Judge Dykes or Judge Moore's questions, the point here is that at this point in the proceedings it's not enough for them to say it's susceptible to more than one reading. They have to prove it. How do they have the fair ground of doubt defense entirely to say if there's vagueness they have to appeal, if there's a fair ground for doubt they have to appeal? How are those two consistent? I mean, we're talking that the fair ground of doubt doesn't say that the party who is subject to the injunction can proceed on its own and ignore it because it has a doubt about that. That's what GTE Sylvania says in the brief we filed in the opening case. At this point, they have to show that the only possible reading is the one that they're giving it, and on that, they're hinging their argument on two insupportable propositions. They say that only their reading can be correct because, number one, no injunction can go beyond infringing activity. That's wrong. And number two, that injunctions have to be forward-looking. Injunctions can't be used under 283 for purposes of sort of repair and retrospective harm. Now, with respect to going beyond infringing activity, this court has said in Selfrow v. Johns Hopkins that a court can enjoin activities that either haven't cringed or are likely to do so. In this case, both of those standards are met. It affirmed just such an order in Spindle Fabrics so that however unusual you might take this provision, it is simply wrong that a court under 283 cannot enjoin activity that is not infringing. In all of those cases, those were called repeat offenders, correct? I mean, the Spindle case was a repeat offender. The Spindle case was a repeat offender. And the footnote, are you referring to the footnote in Johns Hopkins? Well, in the text that goes along... And that seems, I think, I don't have it in front of me, but it does make a suggestion that we're talking about repeat offender conduct. Well, I mean, I actually don't recall that, but the proposition that a court, as a matter of law, an enjoining court, cannot go beyond enjoining infringing activity is belied by the text of 283. 283 says that courts are empowered to issue injunctions in accordance with principles of equity to prevent, not just to prevent infringement, but to prevent violation of any right secured by a patent. And in this case, what the disablement provision did was to prevent future violations by Echostar... Can you give us some final thoughts here, Mr. Waxman? Let me just... I'll just finish my sentence, and I'll do that. Future violations by Echostar in precisely the same manner that Echostar has proceeded to continue to violate this patent with respect to the devices that already had their days in court. Thank you. Thank you, Mr. Waxman. The court has no further questions. I think that I answered all the questions that the court asked. Thank you, Mr. Waxman. Mr. Rosenkranz, you have a little over eight minutes. Thank you, Your Honor. So let me start with the last point first. We are not arguing that this injunction should go our way simply because it was unlawful. That's just the legal backdrop against which it was read. It should be read. We talked about the text, and we talked about the context. If it was unlawful, why didn't you appeal it? Because we did not believe that's what it meant, Your Honor. I mean, Mr. Dunner was standing before this court, and the notion that he read the injunction to be illegal and nevertheless decided not to appeal it seems quite absurd to me. The injunction didn't say that to Echostar. It had no obligation to appeal it. Mr. Waxman said it himself. However unusual this provision is, yes, this would have been an extraordinary unusual provision. On its face, it was unusual. On its face or in context. So why wasn't it appealed initially? What I mean is Thiebaud's reading of the injunction, he put it in such an unusual way that no one would think that that's what it meant. Thiebaud did not ask for a curse on the hardware. Thiebaud did not ask that there shall be no further redesigns as to those boxes. As to those boxes, Thiebaud only asked for the more modest remedy. Now, there's no requirement, contrary to what Mr. Waxman says, to seek clarification if an injunction is ambiguous. If that were the rule, it would override both Granny Goose and Abbott. In Granny Goose, the defendants knew that they had gone to the district court and saw relief from the injunction. Everyone thought they knew what that should mean when the district court said no. So they could have sought clarification. Nevertheless, the Granny Goose rule stands. You cannot be held in contempt if the injunction was unclear. You continue to argue that Thiebaud never argued this. But what about in the briefing regarding the scope of the injunction? I read Thiebaud's arguments on pages 7354 and 7355 to be almost exactly this. It talks about how it doesn't want Echostar to try to provide non-infringing software because it's an invitation for them, an opportunity for interminable disputes over what exactly is infringing DVR software. They seem to be arguing to the court quite clearly exactly what the injunction says, which means they shouldn't be allowed. Echostar should not be allowed to provide even non-infringing software. I understand your point, Your Honor. The only way to understand that snippet of colloquy is to see it in the context in which it was offered. And I urge the court, before accepting Thiebaud's position, it's only six pages worth of advocacy on both sides to read Thiebaud's proposed injunction, it's 7821-22, Thiebaud's brief in support of that injunction, 6062-63, Echostar's opposition, 7916-18, and Thiebaud's reply, which is what Your Honor is reading from, 7354-55. Let me say definitively Thiebaud never said in any of those papers it was seeking a prohibition against design around anywhere. The only way to understand that snippet is to understand what Thiebaud was asking for. Its injunction is on page 78-22, its proposed injunction. It was talking about two different sets of boxes. Paragraph 6 talks only about boxes at the homes, and for those it was asking to remove the infringing hardware. Paragraph 5 sought a recall as to everything else. If it's not in a home, it's on shelves, recall it, destroy it, if that's an infringing product. The fight over those boxes plays out in the sections that I just cited to you, Judge Moore. And Echostar's basic answer was, well, why would we have to destroy those boxes? They don't infringe. They don't have software. They don't infringe until we load on the infringing software, and that's when Thiebaud said, no, too much mischief. The words infringing product are too vague. They should destroy the boxes. The district court said, no, Thiebaud, you don't get a recall. Infringing products is just fine. Everyone knows that that means products that infringe, and the district court rejected Thiebaud's argument. Now, I need to just momentarily reconcile the Supreme Court's prevailing law on thou shalt not violate the law injunctions and McComb. McComb says very clearly, it doesn't overrule those cases, it says this was a persistent and continuous violator. And for persistent and continuous violators, yes, you put on them the onus of having to appeal. And the Fifth Circuit law does not change that one bit. We cite on page 30, footnote 4 of our brief, that every one of those cases was a case where the court of appeals found the injunction clear. So let me then turn very briefly to the issues about the colorable differences point. There was, Your Honors, a huge dispute at the trial about what features did the parsing of video and audio data. At trial, Thiebaud took the position emphatically that it was star code detection. That's what the specs did. They threw up the specs for the jury to see. Dr. Storer, Thiebaud's own witness, corrected, on cross-examination, corrected the counsel when the counsel asked, well, wait a minute, aren't you admitting that PID filters parse? He said, well, yeah. And this is 5073. PID filters perform, quote, a type of parsing. And quote, you shouldn't confuse that with the parsing of the claim terms. Thiebaud's infringement expert at 1580-81, Dr. Gibson, says the same thing. It's all about star code detection. At trial, and by the way, you see it on 1366-67 as well, Thiebaud's inventor. That was the genius of the invention, as Mr. Waxman said. Now, there weren't two constructions of parsing in the two different claims. This was one invention, not two different inventions. Look at 5073. Both sets of claims, I should say, had the same claim language, parsing. The district court viewed them both as the same claim term. The inventor agreed it's all one invention. That's 5548. And I quote from Mr. Barton, the hardware described in the Barton patent and the software described in the Barton patent relate to the same invention. This is the point that Judge Moore was making. It's all one invention. The invention is viewed through the two different lenses. The hardware claims, quote, unquote, view it through the lens of the circuitry. The software claims view it through the lens of the program logic that operates on that circuitry. But your own engineers during the contempt proceedings also referred to the PID filtering as parsing. Yes, Your Honor. Documents were introduced saying that they were parsers. Yes. And they were parsing, right? And the PID filters were, in fact, the parsing elements. No, Your Honor. Parsers are ubiquitous in electronic engineering. But the PID were filtering as parsers. And they are parsers. They parse out. They filter. They analyze the address on the envelope. They cannot read the payload. They cannot read video. But they can filter it out. And so then it becomes a very interesting and brand new question whether that satisfies the claim limitation, parsing video and audio data, in other words, whether they are video and audio data, just because they are an address. So you're saying that they, to understand what you're saying on this, is you're saying that they can review all this data in order to determine whether it is one of the pieces of data, the broadcast data that it's interested in, this PID parser, but it's not analyzing the data in the sense that that term is used. Let me offer a friendly amendment to that, Your Honor, but the answer is basically yes. The PID filter can only read the envelope that contains the payload, the video and audio data. But nonetheless it opens the envelope to check to make sure there are no addresses inside. It reads the address on the envelope. The contents of the envelope, the video and audio data, they are scrambled. They are unreadable by the PID filter. They get unscrambled. Well, it may not be able to read them. Does it not review them in order to determine whether there is address information therein? No, Your Honor. It does not. And by then, let me just finish with this thought. Very interesting question. Very interesting debate. But as Mr. Waxman says, that was not resolved in the earlier trial because EchoStar took out the feature that TiVo had accused of infringing the parser's video and audio data, which is the feature that looks for star codes. Your final thought, Mr. Grant. Yes, Your Honor. The final words. No one disputes that the PID filter is unable to find star codes. Thank you, Your Honors. Thank you. That concludes our morning. All rise.